RECEIVED
SEP 12 2013
U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------x

TERRY DAISE,

                                                    Plaintiff,

                    -against-

THE CITY OF NEW YORK, POLICE OFFICER
ROBERT OVIEDO, SERGEANT JOSEPH FAELLO,
POLICE OFFICER CHERYL TAYLOR, POLICE
OFFICER EDWARD EHRENKRANTZ, POLICE
OFFICER EDWIN PEREZ, SERGEANT JEFFREY
ACAVEDO, and JOHN/JANE DOE # 1 – 3,

                                                    Defendants.
----------------------------------------------------------------------x

~~Second~~ FIRST AMENDED COMPLAINT

13 Civ. 105 (KPF)

JURY TRIAL DEMANDED

## NATURE OF THE ACTION

1.     This is an action to recover money damages arising out of the violation of Mr.

Daise's rights under the Constitution of the United States.

## JURISDICTION AND VENUE

2.     This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth,

Fifth, and Fourteenth Amendments to the Constitution of the United States.

3.     The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343, and

1367(a).

4.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 (b) and (c).

## JURY DEMAND

5.     Mr. Daise demands a trial by jury in this action.

## PARTIES

6.     Mr. Daise Terry Daise ("Mr. Daise" or "Mr. Daise"), an African-American male, is a resident of the State of South Carolina.

7.     Defendant The City of New York is a municipal organization organized under the laws of the State of New York.

8.     Defendant The City of New York operates the New York City Police Department ("NYPD"), a department or agency of Defendant The City of New York.

9.     The NYPD is responsible for the appointment, training, supervision, promotion, and discipline of police officers and supervisory police officers, including the individually named defendants herein.

10.    At all times relevant herein, Defendant Police Officer Roberto Oviedo ("Oviedo") was an officer, employee, and agent of Defendant The City of New York.

11.    At all times relevant herein, Defendant Oviedo was acting within the scope of his employment with Defendant The City of New York.

12.    At all times relevant herein, Defendant Oviedo was acting under color of state law.

13.    Defendant Oviedo is sued in his individual and official capacities.

14.    At all times relevant herein, Defendant Sergeant Joseph Faello ("Faello") was an officer, supervisor, employee, and agent of Defendant The City of New York.

15.    At all times relevant herein, Defendant Faello was acting within the scope of his employment with Defendant The City of New York.

16.    At all times relevant herein, Defendant Faello was acting under color of state law.

17.   Defendant Faello is sued in his individual and official capacities.

18.   At all times relevant herein, Defendant Police Officer Cheryl Taylor ("Taylor") was an officer, employee, and agent of Defendant The City of New York.

19.   At all times relevant herein, Defendant Taylor was acting within the scope of her employment with Defendant The City of New York.

20.   At all times relevant herein, Defendant Taylor was acting under color of state law.

21.   Defendant Taylor is sued in her individual and official capacities.

22.   At all times relevant herein, Defendant Police Officer Edward Ehrenkrantz ("Ehrenkrantz") was an officer, employee, and agent of Defendant The City of New York.

23.   At all times relevant herein, Defendant Ehrenkrantz was acting within the scope of his employment with Defendant The City of New York.

24.   At all times relevant herein, Defendant Ehrenkrantz was acting under color of state law.

25.   Defendant Ehrenkrantz is sued in his individual and official capacities.

26.   At all times relevant herein, Defendant Police Officer Edwin Perez ("Perez") was an officer, employee, and agent of Defendant The City of New York.

27.   At all times relevant herein, Defendant Perez was acting within the scope of his employment with Defendant The City of New York.

28.   At all times relevant herein, Defendant Perez was acting under color of state law.

29.   Defendant Perez is sued in his individual and official capacities.

30.   At all times relevant herein, Defendant Sergeant Jeffrey Acavedo ("Acavedo") was an officer, employee, and agent of Defendant The City of New York.

31.     At all times relevant herein, Defendant Acavedo was acting within the scope of his employment with Defendant The City of New York.

32.     At all times relevant herein, Defendant Acavedo was acting under color of state law.

33.     Defendant Acavedo is sued in his individual and official capacities.

34.     At all times relevant herein, Defendants John/Jane Doe # 1 - 3 were supervisors, officers, employees, and/or agents of Defendant The City of New York.

35.     At all times relevant herein, Defendants John/Jane Doe # 1 - 3 were acting within the scope of their employment with Defendant The City of New York.

36.     At all times relevant herein, Defendants John/Jane Doe # 1 - 3 were acting under color of state law.

37.     Defendants John/Jane Doe # 1 - 3 are sued in their individual and official capacities.

38.     The names John/Jane Doe # 1 - 3 are fictitious, their true names being unknown to Mr. Daise at this time.

## NOTICE OF CLAIM

39.     On October 31, 2011, and within ninety days of the allegations contained herein, a Notice of Claim was filed with the New York City Office of the Comptroller.

40.     At least thirty days have elapsed since the filing of the Notice of Claim, and adjustment or payment of the claims has been refused or neglected.

41.     The instant action has been commenced within one year and ninety days after the occurrence of the events upon which the claims are based.

## STATEMENT OF FACTS

42.     At approximately 6:30 p.m. on October 21, 2011, Mr. Daise was lawfully standing on the sidewalk located near the intersection of 161st Street and Morris Avenue in Bronx, New York.

43.     As Mr. Daise stood on the sidewalk, he had a cigar in his right hand.

44.     As Mr. Daise crossed the street, Defendant Oviedo jumped out of a police van and ran towards Mr. Daise.

45.     The police van was then driven into a position to block Mr. Daise from escaping.

46.     As Defendant Oviedo approached Mr. Daise, he shouted "Don't move!"

47.     Defendant Oviedo asked Mr. Daise what he had in his hand.

48.     Mr. Daise responded that it was a cigar.

49.     Defendant Oviedo said that it wasn't a cigar and that it was drugs.

50.     Defendant Oviedo ordered Mr. Daise to put his hands behind his back.

51.     Mr. Daise turned around to comply, and Defendant Oviedo grabbed his left hand and brought it up behind Mr. Daise's back, causing his left wrist to fracture.

52.     Mr. Daise screamed in pain and begged Defendant Oviedo to stop hurting him, to no avail.  Instead, Defendant Oviedo placed handcuffs on Mr. Daise excessively tight.

53.     Mr. Daise fell to the ground in pain.

54.     As he lay on the ground in pain, Defendants Oviedo, Faello, Taylor, Ehrenkrantz, and Perez (collectively, hereinafter, "Responding Defendants") began kicking and punching Mr. Daise about his entire body causing bruises and cuts.

55.     The Responding Defendants dragged Mr. Daise across the ground to a police van.

56.     Mr. Daise's arrest was approved at the scene by Defendant Faello, despite there being no probable cause to arrest Mr. Daise.

57.     Mr. Daise was searched by the Responding Defendants and placed in the police van and transported to the 44th Precinct.  Nothing was found on Mr. Daise's person.

58.     While being transported to the 44th Precinct, Mr. Daise asked the Responding Defendants to request medical attention for him, but they ignored his pleas.

59.     While being transported to the 44th Precinct, Mr. Daise also asked the Responding Defendants to loosen his handcuffs as they were causing him extreme pain, but they ignored his pleas.

60.     At the precinct, Mr. Daise' handcuffs were removed and he was instructed to take off his shoes.

61.     The individual defendants told Mr. Daise that he had better not hit them with his shoe strings.

62.     Mr. Daise asked the individual defendants what they were talking about.

63.     In response, the individual defendants grabbed Mr. Daise and threw him against a wall.

64.     Handcuffs were again placed on Mr. Daise by the individual defendants and he was placed in a cell.

65.     Mr. Daise pleaded with the individual defendants to loosen his handcuffs as they were hurting him.

66.     Instead of loosening Mr. Daise's handcuffs, the handcuffs were made even tighter by the individual defendants.

67.    Mr. Daise begged the individual defendants for a doctor.

68.    Approximately two to three hours later, Emergency Medical Services ("EMS") was called to the precinct.

69.    EMS transported Mr. Daise to Lincoln Hospital.  However, the individual defendants would only allow Mr. Daise to be transported in handcuffs, despite the condition of Mr. Daise's left wrist.

70.    During his time at Lincoln Hospital, Mr. Daise was informed that his left wrist was indeed fractured.

71.    At some point after being discharged from Lincoln Hospital, Mr. Daise was transported to Bronx Central Booking.

72.    The individual defendants spoke with the Bronx County District Attorneys' Office (BCDAO), individually and collectively lying to the BCDAO that Mr. Daise had violated New York Penal Law § 205.30.

73.    Based on these fabricated allegations, the BCDAO forwarded to Defendant Oviedo a Criminal Court Complaint.

74.    The Criminal Court Complaint was reviewed and then signed by Defendant Oviedo.

75.    When reviewing and signing the Criminal Court Complaint, Defendant Oviedo knew the allegations contained therein to be false.

76.    The Criminal Court Complaint was then forwarded by Defendant Oviedo to the BCDAO.

77.     Legal process was issued against Mr. Daise, and Mr. Daise was subsequently arraigned.

78.     During the pendency of the criminal proceeding, the individual defendants forwarded false evidence to the New York County District Attorney's Office, *inter alia*, arrest reports, complaint reports, and property vouchers.

79.     After his arraignment, Mr. Daise was held in custody.

80.     As a result of the foregoing, Mr. Daise was deprived of his constitutional rights and suffered serious emotional; psychological; and injuries, *inter alia*, to his hands, wrists, face, and body.

## FIRST CAUSE OF ACTION
### *42 U.S.C. § 1983*

81.     Mr. Daise repeats and realleges each and every allegation as if fully set forth herein.

82.     Defendants, by their conduct toward Mr. Daise as alleged herein, violated Mr. Daise 's rights guaranteed by 42 U.S.C. § 1983, the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States.

83.     As a direct and proximate result of this unlawful conduct, Mr. Daise sustained the damages herein alleged.

## SECOND CAUSE OF ACTION
### *Unlawful Stop and Search*

84.     Mr. Daise repeats and realleges each and every allegation as if fully set forth herein.

85.     Responding Defendants violated the Fourth and Fourteenth Amendments because they stopped and searched Mr. Daise without reasonable suspicion.

86.     As a direct and proximate result of this unlawful conduct, Mr. Daise sustained the damages herein alleged.

### THIRD CAUSE OF ACTION
#### *State Law False Arrest and False Imprisonment*

87.     Mr. Daise repeats and realleges each and every allegation as if fully set forth herein.

88.     By their conduct as described herein, the Responding Defendants are liable to Mr. Daise for falsely imprisoning and falsely arresting him.

89.     Mr. Daise was conscious of his confinement.

90.     Mr. Daise did not consent to his confinement.

91.     Mr. Daise's confinement was not otherwise privileged.

92.     Defendant The City of New York, as an employer of the Responding Defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

93.     As a direct and proximate result of this unlawful conduct, Mr. Daise sustained the damages herein alleged.

### FOURTH CAUSE OF ACTION
#### *State Law Assault and Battery*

94.     Mr. Daise repeats and realleges each and every allegation as if fully set forth herein.

95.     By their conduct as described herein, the individual defendants are liable to Mr. Daise for having assaulted and battered him.

96.     Defendant The City of New York, as an employer of the individual defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

97.     As a direct and proximate result of this unlawful conduct, Mr. Daise sustained the damages herein alleged.

### FIFTH CAUSE OF ACTION
#### *State Law Negligent Hiring, Retention, and Training*

98.     Mr. Daise repeats and realleges each and every allegation as if fully set forth herein.

99.     Defendant The City of New York, through the NYPD, owed a duty of care to Mr. Daise to prevent the conduct alleged, because, under the same or similar circumstances, a reasonable, prudent, and careful person should have anticipated that injury to Mr. Daise or to those similarly situated would probably result from the foregoing conduct.

100.    Upon information and belief, all of the individual defendants were unfit and incompetent for their positions.

101.    Upon information and belief, Defendant The City of New York knew or should have known through the exercise of reasonable diligence that the individual defendants were potentially dangerous.

102.    Upon information and belief, Defendant The City of New York's negligence in screening, hiring, training, disciplining, and retaining the individual defendants proximately caused each of Mr. Daise's injuries.

103.    As a direct and proximate result of this unlawful conduct, Mr. Daise sustained the damages herein alleged.

## SIXTH CAUSE OF ACTION
### *False Arrest*

104.   Mr. Daise repeats and realleges each and every allegation as if fully set forth herein.

105.   Responding Defendants violated the Fourth and Fourteenth Amendments because they arrested Mr. Daise without probable cause.

106.   As a direct and proximate result of this unlawful conduct, Mr. Daise sustained the damages herein alleged.

## SEVENTH CAUSE OF ACTION
### *Excessive Force*

107.   Mr. Daise repeats and realleges each and every allegation as if fully set forth herein.

108.   The individual defendants violated the Fourth and Fourteenth Amendments because they used unreasonable force on Mr. Daise.

109.   As a direct and proximate result of this unlawful conduct, Mr. Daise sustained the damages herein alleged.

## EIGHTH CAUSE OF ACTION
### *Denial of Substantive Due Process*

110.   Mr. Daise repeats and realleges each and every allegation as if fully set forth herein.

111.   The individual defendants created false evidence against Mr. Daise.

112.   The individual defendants forwarded false evidence to prosecutors in the BCDAO.

113.    In creating false evidence against Mr. Daise, and in forwarding false evidence to prosecutors, the individual defendants violated Mr. Daise's right to substantive due process under the Due Process Clause of the Fifth and Fourteenth Amendments of the Constitution of the United States.

114.    As a direct and proximate result of this unlawful conduct, Mr. Daise sustained the damages herein alleged.

## NINTH CAUSE OF ACTION
### *State and Federal Malicious Abuse of Process*

115.    Mr. Daise repeats and realleges each and every allegation as if fully set forth herein.

116.    The individual defendants issued legal process, or caused legal process to be issued, to place Mr. Daise under arrest.

117.    The individual defendants arrested Mr. Daise in order to obtain collateral objectives outside the legitimate ends of the legal process, to wit, to cover up their unlawful stop, search, and assault of him; their prejudice against persons who are African American; and to cover up Defendant The City of New York's pattern and practice of racial profiling.

118.    The individual defendants continued to pursue this collateral objective after the issuance of legal process by coercing the BCDAO to prosecute Mr. Daise by continuing to lie to the BCDAO about Mr. Daise's actions and by forwarding to the BCDAO false evidence.

119.    The individual defendants acted with intent to do harm to Mr. Daise without excuse or justification.

120.    As a direct and proximate result of this unlawful conduct, Mr. Daise sustained the damages herein alleged.

## TENTH CAUSE OF ACTION
### *State and Federal Malicious Prosecution*

121.    Mr. Daise repeats and realleges each and every allegation as if fully set forth herein.

122.    The individual defendants initiated the criminal proceedings against Mr. Daise by issuing legal process against him or by causing legal process to be issued against him.

123.    The individual defendants lacked probable cause to commence the criminal proceedings against Mr. Daise.

124.    The individual defendants' actions were motivated by actual malice.

125.    The criminal proceeding against Mr. Daise was terminated in Mr. Daise's favor.

126.    As a direct and proximate result of this unlawful conduct, Mr. Daise sustained the damages herein alleged.

## ELEVENTH CAUSE OF ACTION
### *Failure to Intervene*

127.    Mr. Daise repeats and realleges each and every allegation as if fully set forth herein.

128.    Those defendants that were present but did not actively participate in the aforementioned unlawful conduct observed such conduct; had an opportunity to prevent such conduct; had a duty to intervene and prevent such conduct; and failed to intervene.

129.    Accordingly, the defendants who failed to intervene violated the Fourth, Fifth, and Fourteenth Amendments of the Constitution of the United States.

130.    As a direct and proximate result of this unlawful conduct, Mr. Daise sustained the damages herein alleged.

### TWELFTH CAUSE OF ACTION
*Equal Protection Clause under 42 U.S.C. § 1983*

131.    Mr. Daise repeats and realleges each and every allegation as if fully set forth herein.

132.    The Defendants' conduct was tantamount to discrimination against Mr. Daise based on his ethnicity.  This disparate treatment caused Mr. Daise to suffer serious injuries.

133.    The NYPD discriminatory program is pervasive and evident throughout many of its practices, including those used to stop, question, frisk, and arrest Mr. Daise.

134.    The NYPD has maintained illegal stop and question practices, as part of a systematic discriminatory program aimed towards minorities. The searches occur nearly every day without the requisite level of suspicion, and are so customary as to constitute official municipal policy.

135.    One such program is the Clean Halls Buildings program, which initially created to combat illegal activity in apartment buildings.  Many buildings are enrolled and remain in the program without regard to whether there is sustained or substantial crime.  Thus, residents and their unsuspecting guests are left subject to the unscrupulous stop, question, search, citation, and arrest practices of local NYPD officers.

136.    The impact on Blacks and Latinos as compared to Whites is disparaging and significant. From 2006 to 2010, approximately 94.4% of those stopped and questioned for trespassing were Black and Latino, although they only accounted for 52% of the New York City

population.  Blacks and Latinos were 6 times more likely to be stopped by police than Whites,

Asians, and Native Americans combined.

137.   The NYPD has also maintained illegal stop and frisk policies, as part of a

systematic discriminatory program aimed towards minorities.

138.   The New York State Attorney General's 1999 inquiry into the NYPD's stop and

frisk program found that between the 175,000 "UF-250" stop and frisk forms filed by officers

indicated consistent and significant racial skewing.

139.   According to the report, Blacks comprised 25.6% of the City's population, yet

50.6% of all persons stopped were Black.  Hispanics comprised 23.7% of the City's population

yet, 33.0% of all stops were of Hispanics.  By contrast, Whites made up 43.4% of the City's

population, but accounted for only 12.9% of all stops.  The disparities were further pronounced

in precincts where the majority of the population was White. Where Blacks and Hispanics each

represent less than 10% of the population, Blacks and Hispanics accounted for more than 50% of

stops during any given period. The New York State Attorney General's finding was that 8 out of

9 searches did not uncover contraband.

140.   Under the NYPD's policy, if a person is stopped and questioned without official

use of force (or with consent) and gives his or her name, documentation is not required.

Consequently, NYPD officers frequently do not to file the proper UF-250 form to record stop

and frisk searches.

141.   Many experts believe the numbers available from NYPD offices do not accurately

reflect the discrimination of the NYPD's stop and frisk program. In one independent street

interview conducted with 100 Black and Hispanic males between the ages of 14 and 35, 81 participants reported having been stopped, patted down and questioned, without being arrested.

142. The NYPD arrests more Blacks, Hispanics, and other minorities as compared to Whites in furtherance of its systematic discriminatory program.

143. The NYPD frequently uses marijuana arrest cases to bolster both its productivity and arrest reports. Marijuana possession is an infraction payable by fine in New York City, yet from 1997 to 2006, 52% Blacks, 31% Hispanics were arrested for possession of marijuana, as compared to 15% of Whites.

144. Despite the overwhelming evidence from U.S. government surveys that have consistently shown young Whites between the ages of 18 and 25 using marijuana at higher rates than either young Hispanics and Blacks, in 2006, the marijuana arrest rate of Blacks was five times that of Whites. The arrest rate of Hispanics in 2006 was nearly three times that of Whites.

145. Arrest records consistently show that where minorities represent a small portion of the population, they also represent the majority of arrestees (with the exception of Staten Island). In Staten Island, Blacks were about 10% of the population, but were 37% of marijuana arrestees. In Manhattan, Blacks were about 17% of the population, but accounted for 43% of marijuana arrestees. In Queens, Blacks were about 20% of the population, but accounted for 57% of marijuana arrestees. In Brooklyn, Blacks were about 36% of the population, but were an overwhelming 65% of marijuana arrestees. Finally, in the Bronx, Blacks were 36% of the population, but accounted for 48% of marijuana arrestees. The White population and the White percentage of marijuana arrestees in each borough were equally skewed, but in the opposite direction.

146.    Trespassing and marijuana arrests are the most effective means available for obtaining fingerprints, photographs, and DNA samples (since 2006) from people never before entered in the criminal justice databases.  Where those trespassing and marijuana stops result in the issuance of a fine rather than arrest, the outcome is often still detrimental.  Often times, young persons in the housing projects (such as those enrolled in the Clean Halls Buildings program) or other poor neighborhoods do not have the means to pay the fines, and a criminal courts will issue a warrant for their arrest.  Many times, the subsequent occasion on which that person is stopped, questioned, frisked, or searched by the NYPD, the outstanding warrant will ultimately serve as a basis for arrest.

147.    In fact, Defendant The City of New York is estopped from asserting that such discrimination and tactics do not occur.  In Floyd, et al. v. The City of New York, 08 Civ. 1034 (SAS) (S.D.N.Y. Aug. 12, 2013), the Court found that "[t]he NYPD's practice of making stops that lack individualized suspicion has been so pervasive and persistent as to become not only part of the NYPD's standard operating procedure, but a fact of daily life in some New York City neighborhoods."  See Floyd, Docket Entry No. 373 at p. 180.

148.    The Court goes on to find that Defendant The City of New York, in fact, has a policy of indirect racial profiling, and that senior officials of Defendant The City of New York have been deliberately indifferent to the tactics used by NYPD's members.  See id. at p. 181.

149.    As a result of the foregoing, Mr. Daise was deprived of rights under the Equal Protection Clause of the Constitution of the United States, and are thereby entitled to damages.

## THIRTEENTH CAUSE OF ACTION
### Conspiracy under 42 U.S.C. § 1983

150.   Mr. Daise repeats and realleges each and every allegation as if fully set forth herein.

151.   The Defendants jointly participated in the deprivation of Mr. Daise's constitutional rights as set forth herein.

152.   The Defendants conspired with the BCDAO in the deprivation of Mr. Daise's constitutional rights by collectively lying about Mr. Daise's actions and conduct, and intentionally withholding and/or destroying exculpatory evidence in order to support the Defendants' fabricated version of the events.

153.   As a result of the Defendants' malicious efforts to damage Mr. Daise, Mr. Daise's liberty was restricted, he was restrained, injured while in custody, subjected to handcuffing, and, among other things, falsely arrested and prosecuted.

154.   As a direct and proximate result of this unlawful conduct, Mr. Daise sustained the damages herein alleged.

## FOURTEENTH CAUSE OF ACTION
### Monell

155.   Mr. Daise repeats and realleges each and every allegation as if fully set forth herein.

156.   This is not an isolated incident. Defendant The City of New York, through its policies, customs, and practices, directly caused the constitutional violations suffered by Mr. Daise.

157. Defendant The City of New York, through the NYPD, has had, and still has, hiring practices that it knows will lead to the hiring of police officers lacking the intellectual capacity and moral fortitude to discharge their duties in accordance with the Constitution of the United States and is indifferent to the consequences.

158. Defendant The City of New York has stop and frisk tactics and procedures that encourages unlawful stops, unlawful searches, false arrests, the fabrication of evidence, and perjury.

159. As noted, supra, Defendant The City of New York is estopped from asserting that these stop and frisk tactics do not exist and that they are unlawful.

160. Defendant The City of New York, through the NYPD, has a *de facto* quota policy that encourages unlawful stops, unlawful searches, false arrests, the fabrication of evidence, and perjury.

161. This quota policy requires that police officers, including the individual defendants named herein, make a certain number of arrests and/or write a certain number of summonses and desk appearance tickets within an allocated time period.

162. Officers that meet the required number of arrests, summonses, and desk appearance tickets are classified as active officers.

163. Officers that do not meet the required number of arrests, summonses, and desk appearance tickets are classified as inactive officers.

164. Active officers are given promotion opportunities that are not afforded to inactive officers.

165.   Active officers are given overtime opportunities, such as security at parades, etc., that are not afforded to inactive officers.

166.   The quota policy does not differentiate between arrests, summonses, and desk appearance that are supported by probable cause and ones that are note.

167.   Defendant The City of New York, through the NYPD, does nothing to ensure that officers, in trying to fulfill this quota policy, are making arrests and issuing summonses and desk appearance tickets lawfully.  There are no post-arrest investigations that are performed, and no policies in place that would prevent abuse of this policy, such as is demonstrated in the instant case.

168.   Defendant The City of New York, through the NYPD, does nothing to determine the outcome of the charges levied against arrestees in order to proper counsel officers as to the lawfulness of their arrests/issuance of summonses and desk appearance tickets.

169.   The failure of Defendant The City of New York to, *inter alia*, take these steps encourages, *inter alia*, unlawful stops, unlawful searches, false arrests, the fabrication of evidence, and perjury, in that the quota policy provides, *inter alia*, career and monetary incentives to officers, including the individual defendants herein.

170.   Defendant The City of New York is estopped from asserting that a quota/productivity policy does not exist and that this policy motivates police officers to violate the rights of individuals.  See Bryant v. The City of New York, 022011/2007 (Kings Cnty. Sup. Ct.) (jury finding that quota policy exists and that it contributed to constitutional rights violations).

171.    Defendant The City of New York, through the NYPD, has a *de facto* overtime policy that encourages and incentivizes unlawful stops, unlawful searches, false arrests, the fabrication of evidence, and perjury.

172.    Defendant The City of New York, through the NYPD, provides officers, including the individual defendants herein, with overtime opportunities when arrest are made, or summonses and desk appearance tickets are issued.

173.    Upon making an arrest or issuing summons or desk appearance ticket, an arresting officer submits a request for overtime to his commanding officer.

174.    These requests are essentially rubberstamped, with commanding officers performing no investigation into the circumstances of the arrest.

175.    Defendant The City of New York, through the NYPD, does not perform any post-arrest investigation and there are no policies in place to prevent abuse of this overtime policy.

176.    As a result of this overtime policy, officers, including the individual officers named herein, abuse this overtime policy, making baseless arrests and wrongfully issuing summonses and desk appearance tickets to substantially supplement their income through overtime pay.

177.    Defendant The City of New York, at all relevant times, was aware that the individual defendants routinely committed constitutional violations such as those at issue here and has failed to change its policies, practices, and customs to stop this behavior.

178.    Defendant The City of New York, at all relevant times, was aware that the individual defendants are unfit officers who have previously committed the acts alleged herein and/or have a propensity for unconstitutional conduct.

179.    These policies, practices, and customs were the moving force behind Mr. Daise's injuries.

## PRAYER FOR RELIEF

**WHEREFORE**, Mr. Daise respectfully requests judgment against Defendants as follows:

(a)    Compensatory damages against all defendants, jointly and severally;

(b)    Punitive damages against the individual defendants, jointly and severally;

(c)    Reasonable attorney's fees and costs pursuant to 28 U.S.C. § 1988; and

(d)    Such other and further relief as this Court deems just and proper.

Dated: New York, New York
       September 11, 2013

Gregory P. Mouton, Jr., Esq.
The Law Office of Gregory P. Mouton, Jr.
Attorney for Plaintiff Terry Daise
305 Broadway, 14th Floor
New York, NY 10007
Phone & Fax: (646) 706-7481
greg@moutonlawnyc.com